**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**C. B. DUKE, Jr., Defendant-Appellant.
No. 73-1276.**

United States Court of Appeals,
Fifth Circuit.

April 12, 1974.

Rehearing Denied May 8, 1974.

Jack N. Price, Longview, Tex., for defendant-appellant.

Roby Hadden, U. S. Atty., Dale Long, and Dennis R. Lewis, Asst. U. S. Attys., Tyler, Tex., for plaintiff-appellee.

Before GODBOLD, DYER and GEE, Circuit Judges.

GODBOLD, Circuit Judge:

The appellant was convicted of two counts of misapplication of bank funds [1] and six counts of making false entries,[2] while president of a bank in the town of Atlanta, Texas. The convictions must be reversed for improper cross-examination by the prosecution in an effort to impeach testimony concerning appellant's reputation for honesty and integrity.

The defense put in issue the appellant's reputation for honesty and integrity by introducing the testimony of Ransom C. Hardy, who was a resident of Atlanta and general manager of an oil, land and timber company and a director of the other bank in the town. Hardy testified to Duke's good reputation for truth and veracity and as a peaceable and law abiding citizen. The government then advised the court that it intended to question any character (i. e., "reputation") witness as to whether the witness had heard that defendant Duke took $7,500 from the (bank) account of George Eaves and did not return it to him. The trial judge took up the matter in chambers, where he required the As-sistant United States Attorney conducting the trial to be sworn and to state the factual basis for asking the question. The basis described was that George Eaves had testified before the grand jury investigating charges against appellant Duke to the following effect. Eaves had relinquished his large safe deposit box in the bank of which Duke was president to make it available to a customer requiring a large box, and at that time Eaves had entrusted $5,400 in cash to Duke for safekeeping until another box was available. According to Prosecutor Long, Eaves told the grand jury that he and his wife asked several times for return of the money, that Duke refused to return it and admitted he had used it for his own benefit, that Duke stated to Eaves that "the money was as much his (Duke's) as it was Mr. Eaves', in view of the fact that he felt Mr. Eaves was concealing this money from the Internal Revenue Service." On being cross-examined in chambers, Prosecutor Long acknowledged that he had in his file photocopies of a note from Duke to Eaves for $5,400 and a check of later date from Duke to Eaves for $5,400. Long acknowledged also that he was aware that other officers of the bank (one of them the chairman of the board) knew of the Eaves-Duke matter, and that Duke continued as president of the bank for nine months after the note was paid. Defense counsel pointed out to the court that there was a dispute whether the $5,400 was in fact a loan to Duke by Eaves.[3]

After timely objections by the defense, the court permitted witness Hardy to be cross-examined by Long in the presence of the jury as follows:

Q. Mr. Ransom (sic), have you heard that Mr. C. B. Duke took $5400.-00, $5,400.00 from Mr. George

---

1. In violation of 18 U.S.C.A. § 656.

2. In violation of 18 U.S.C.A. § 1005.

3. We attach no significance to the fact that the prosecutor, in orginally stating to the court what he intended to cover in cross-examination, referred to $7,500 and to its coming "from the account" of Eaves. Those discrepancies were ironed out in the hearing in chambers at which Prosecutor Long testified.

(Pete) Eaves and refused to pay it back?

A. I don't know anything about that. I never heard of it.

Q. Well, have you heard that he refused to pay the money back until the Chairman of the Board, Mr. T. L. Richey, forced him to do so?  .

A. I never heard anything—first I have heard it mentioned.

The same questions were later asked by the prosecution of another reputation witness, Vasco Brabham, president of a savings and loan association in Atlanta, and he answered all in the negative.

■■■ It was reversible error to permit this cross-examination of the reputation witnesses. Our concern is with a body of law that the Supreme Court in the leading case of Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L. Ed. 168 (1948), has termed "archaic, paradoxical and full of compromises and compensations by which an irrational advantage to one side is offset by a poorly reasoned counterprivilege to the other." Id. at 486, 69 S.Ct. at 223, 93 L.Ed. at 179. The defendant may introduce evidence of his reputation ("character"), and such a witness not only may but must base his testimony upon hearsay, in effect summarizing what he has heard in the community. As a counterweight the prosecution may present contradictory witnesses as to defendant's reputation and may subject defendant's character witness to cross-examination as to the contents and extent of the hearsay on which he bases his conclusion, and he may be required to disclose rumors and reports that are current even though they do not affect his own conclusion. Id. at 477–479, 69 S.Ct. at 219–220, 93 L.Ed. at 174–175. The prosecution may not meet the defendant's reputation evidence by cross-examination (or testimony of contradictory witnesses) directed to specific acts and occurrences. Evidence of reputation must be met by other evidence of reputation, else the trial degenerates into a confusing and distracting trial of innumerable collateral issues. Permitting this anomalous type of hearsay testimony is predicated upon the concept that the evidence "is not as to the personality of defendant but only as to the shadow his daily life has cast in the neighborhood." Id. at 477, 69 S.Ct. at 219, 93 L. Ed. at 174. The prosecutor may, however, inquire into the character witness' grounds of knowledge in order to test the underpinnings for his statement that the defendant enjoys a good reputation, that is, "to test the qualifications of the witness to bespeak the community opinion." Id. at 483, 69 S.Ct. at 222, 93 L. Ed. at 177.

When witness A is called to support the character of B (either a witness or an accused), by testifying to his good reputation, that reputation must signify the general and unqualified consensus of opinion in the community (§§ 1610–1614 infra). Such a witness virtually asserts either (a) that the testifier has never heard any ill spoken of the other or (b) that the sum of the expressed opinion of him is favorable. Now if it appears that this sustaining witness knows of bad rumors against the other, then, in the first instance, his assertion is entirely discredited; while, in the second instance, his assertion is deficient in good grounds, according to the greater or lesser prevalence of the rumors. On this principle, then, it is proper to probe the asserted reputation by learning whether such rumors have come to the witness' knowledge; for if they have, it is apparent that the alleged reputation is more or less a fabrication of his own mind.

It is to be noted that the inquiry is always directed to the witness' hearing of the disparaging rumor as negativing the reputation. There must be no question as to the fact of the misconduct, or the rule against particular facts would be violated; and it is this distinction that the courts are constantly obliged to enforce  .    .    .    .

IIIA Wigmore, Evidence (Chadbourn ed.) § 988 at p. 912. From this right to inquire into grounds of knowledge comes the "have you heard" genus of questions such as were employed in this case.

In *Michelson* the Court recognized that there is a heavy responsibility on the trial judge to prevent misuse by defense or prosecution of the scope of examination permitted in this battle of hearsay. It approved a procedure under which the trial judge "took pains to ascertain, out of the presence of the jury, that the target of the question was an *actual event*, which would probably result in some comment among acquaintances if not injury to defendant's reputation." *Id.* at 481, 69 S.Ct. at 221, 93 L.Ed. at 176. (emphasis added). Hypothetically, if the inquiry is to be: "Have you heard that on Jan. 1, 1970, the defendant was arrested on a charge of embezzlement?", the court ascertains that the prosecutor has reasonable basis to believe that defendant in fact was arrested on an embezzlement charge.[4] If the existence of the event is disputed, then the trial should not degenerate into the collateral inquiry which the use of composite hearsay is intended to make unavailable.

■ In the present case the court employed the correct procedure. Since the factual basis for the proposed question was in doubt, the District Judge required a statement from the prosecutor, given outside the presence of the jury.[5] But at the end of the in camera proceeding the doubt remained. As defense counsel told the court, Duke claimed that Eaves had lent him $5,400. The existence of the note and the later-dated cancelled check tended to support that interpretation of the Eaves-Duke transaction. The knowledge of other bank officers, and retention of Duke as president for nine months after the note was paid, tended to negate misconduct on Duke's part. In its discretion the court could have gone deeper, giving the prosecution further opportunity to show a factual basis for its proposed line of inquiry, but it could not stop in midstream and accept as the predicate for a counterattack on defendant's reputation an event whose existence remained in such doubt.

Secondly, the transaction described by Eaves, and redescribed by Long, was essentially private in nature and, at least without further proof, was not shown to be the kind of occurrence likely to have become a matter of general knowledge, currency or reputation in the community.[6] The most logical inference is to the contrary, since embraced within it was an alleged assertion by Duke that Eaves was himself violating the law by concealing the $5,400 from the Internal Revenue Service, a charge which Eaves and his wife could hardly be expected to release for general consumption. Prosecutor Long's own knowledge came from the carefully guarded proceedings of the grand jury. The government's assertion that the dealings with Eaves "necessarily affected Duke's reputation in the community" has no evidentiary support.

---

4. Indeed, some courts have declined to permit such inquiry into arrest unless the prosecution has in hand official documents to support the existence of the event.

5. Our conclusion that this was the correct way for the District Court to proceed does not conflict with United States v. Franklin, 471 F.2d 1299 (CA5, 1973). There we held that the prosecution's cross-examination of defendant himself, and its quizzing its own witnesses on the subject of his alleged prior acts, constituted a blatant attempt to prove up the prior misconduct. Hence we reversed, but in doing so approved a "have you heard" question directed, as in the present case, only at the de-

fendant's own reputation witnesses, even though the prosecution had not previously proved the existence of a factual basis in chambers. But the difference is that in *Franklin* the defendant did not dispute the existence of a factual basis, and, indeed, events at the trial, though cause for reversal on other grounds, showed that he could not reasonably have disputed it.

6. *Cf.* Aaron v. United States, 397 F.2d 584 (CA5, 1968) (question held improper when its basis was an event wholly immaterial to the aspect of his reputation that defendant placed in issue; but error held harmless because other evidence made guilt clear).

 

Finally, we note an additional defect in the trial procedure. The Eaves-Duke transaction had been the subject of a voluntarily dismissed count of the same indictment under which appellant was tried and convicted.[7] The potential for undue prejudice to the appellant from permitting a question based on such a closely-related and serious charge is obvious. *Cf.* Shimon v. United States, 122 U.S.App.D.C. 152, 352 F.2d 449 (1965). Moreover, having inquired whether the witness had heard that appellant accepted the money and refused to pay it back, and having elicited a negative response, the prosecutor pressed ahead and asked whether the witness had heard that appellant had refused to make repayment until forced to do so. By sharpening the inquiry and introducing an aspect of the alleged transaction not previewed at all in chambers, the prosecutor crossed the line between cross-examining so as to cast doubt upon a "character" witness' ability to reflect accurately the community opinion of appellant's reputation, and seeking affirmatively to prove to the jury the appellant's alleged prior misconduct. See United States v. Franklin, 471 F.2d 1299, 1303–1304 (CA5, 1973).

Because of the possibility of retrial we point out that the court gave an erroneous version of the "Allen" charge.[8] This court has permitted continued use of the "Allen" charge. United States v. Bailey, 480 F.2d 518 (CA5, 1973) (en banc); United States v. Ozuna-Amador, 480 F.2d 610 (CA5, 1973). But in this case the court went beyond the limits permitted by *Bailey,* because, *inter alia,* it added this:

> This issue has been tried out very ably by both sides, and all the available evidence has been adduced before you, and *a decision has to be reached by a jury. You are that jury,* and it seems to me that you ought to make every effort to arrive at a unanimous

verdict and to reach a conclusion. (Emphasis added.)

While the last qualifying clause of the second sentence tended to ameliorate the earlier (italicized) words, we are unwilling to speculate on whether the jury was disabused of what it had just been told, which was that a jury was required to reach a decision and it was that jury.

Reversed and remanded.

---

7. The government had chosen to dismiss the count before trial because of statute of limitations problems.

8. To which the defense did not object.