**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Perry Joseph CHERAMIE,
Defendant-Appellant.**

**No. 74–3380.**

United States Court of Appeals,
Fifth Circuit.

Oct. 3, 1975.

---

Evangeline T. M. Vavrick, New Orleans, La., for defendant-appellant.

Gerald J. Gallinghouse, Stephen A. Mayo, Mary Williams Cazalas, Asst. U. S. Attys., New Orleans, La., for plaintiff-appellee.

Before CLARK, Associate Justice,* and GOLDBERG and AINSWORTH, Circuit Judges.

GOLDBERG, Circuit Judge:

This case presents a challenge to the district court's intervention during jury deliberation in defendant's trial for violation of the Gun Control Act of 1968, 26 U.S.C. § 5861(d) and (i). While loathe to permit trial judge interference with jury responsibilities, we are careful to preserve the judge's flexibility lest he be no more than a robed mummy presiding at trial. Here we find that the trial judge acted as an active, alert judicial moderator and not as a harmful intermeddler or totally passive observer. He filled the role of curator of justice—a task essential to the equitable functioning of our jurisprudential system. We applaud his conduct and affirm his decision.

## I. Factual Setting

On the afternoon of March 19, 1973, four detectives with the Lafourche, Louisiana, Parish Sheriff's Office journeyed to the Exile Lounge, situated on Louisiana Highway 24 between Bourg and Larose, for the purpose of arresting defendant Perry Joseph Cheramie on charges of aggravated assault, pandering, operating without a permit, soliciting for prostitution, and kidnapping, and also for the further purpose of executing a search warrant. Finding Cheramie at the bar, the local officers arrested defendant, informing him of the above-enumerated charges and advising him of his constitutional rights. Incident to the arrest, Officer Paul Lirette searched Cheramie, discovering a pen-like object in the upper left pocket of defendant's jumpsuit. Further examination uncovered a live .38 special bullet lodged in the pen's cartridge. Sergeant Lirette testified that after having concluded that the pen was in fact a gun, he asked defendant why he had the weapon. According to the officer, Cheramie responded that he had found "this thing" under the seat of a newly purchased automobile and kept it on his person for protection.

On June 28, 1973, Cheramie was indicted on two counts of violating the Gun Control Act of 1968: first, for knowing possession of an unregistered firearm contrary to the provisions of the Gun Control Act, 26 U.S.C. § 5861(d); and second, for knowing possession of a pen-type firearm not identified by a serial number as required by the Gun Control Act, 26 U.S.C. § 5861(i). After a finding that the defendant was mentally competent to stand trial and after a denial of defendant's motion to suppress, the trial commenced. No evidence was introduced which controverted the officer's testimony as outlined above. The presentation of evidence took only part of the first day. Unable to reach a decision that evening, the court dismissed the jury until the next morning, when, after brief consideration, the jurors returned guilty verdicts on both counts. Subsequently, Cheramie was sentenced to five years imprisonment on each charge, with the second five years suspended.

* Of the Supreme Court of the United States (Retired) sitting by designation.

## II. The Challenge to the First Day's Supplemental Charge

 Asserting that the jury was unfairly pressured into reaching a verdict, the defendant assigns as error the first supplemental charge given by the district judge. Where it is alleged that a supplemental charge coerced the jury in its decision-making, this court examines not only the language of the additional instruction but also the facts and circumstances which formed the context for the judge's remarks. *Jenkins v. United States,* 1965, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957; *United States v. Bailey,* 5 Cir. 1972, 468 F.2d 652, 664, *aff'd.,* 1973, 480 F.2d 518 (en banc); *Powell v. United States,* 5 Cir. 1961, 297 F.2d 318, 322.

The facts comprising the backdrop in the instant case are straightforward. The parties presented their evidence and argument during the first trial day. At 4:30 p. m., the jury began deliberating. Three hours later, responding to a note communicating the jury's inability to reach a unanimous verdict, the judge recalled the twelve jurors and instructed them as follows:

"THE COURT: I have received a note from the jury to the effect that you have not been able to reach a unanimous verdict. I take it that means to either count.

"I don't want to know how the jury stands numerically, but I want to say this to the jury:

"There is no reason to believe that any other jury would be better able to understand this case. That includes the facts and the law, as the Court has given you the law.

"The facts, the Court believes, are relatively simple.

"The Court believes that this case should be decided, if it can be done conscientiously, if the jurors can do so conscientiously.

"We could stay here tonight and work longer, but some of the jurors live out of town. Therefore, I am going to ask all the jurors to come back tomorrow morning and resume their deliberations.

"If at that time the Court can help in any way, in repeating a part of, or all of the charge, I will be glad to do so.

"The jury may now be excused until tomorrow morning at 10:00 o'clock."

The next morning, after the jury had deliberated for less than an hour and in response to an inquiry from that panel, the court gave further instructions on the meaning of the words "unlawfully" and "knowingly."[1] Again the jurors

---

1. The foreman's inquiry and the judge's response was as follows:

"THE COURT: Now, just tell me what is it you want to know.

"THE FOREMAN: All right, sir. This is what we would like to know, and we would like this explained to us so we can come to an equitable decision:

"In the first charge the wording of 'knowingly' and 'unlawfully' did possess a firearm, as defined by the section, of Title 26— 'knowingly and unlawfully'.

"Now, if you will recall the testimony of one of the deputies, there was a deputy that said he believed it was a weapon the first time he saw it.

"THE COURT: Well, let's not get into a discussion of the testimony.

"THE FOREMAN: No, I just wanted to—

"THE COURT: I understand.

"THE FOREMAN: We would like that explained to the jury. This is one of the problems.

"THE COURT: The problem is whether he knew it was a gun; is that what you mean?

"THE FOREMAN: No, sir; whether he knowingly and unlawfully knew that this was a weapon that was restricted by the Courts, and by this title of the law; in other words, there is a possibility that he didn't know that this was a violation of the law.

"THE COURT: Let me say this: Everyone is presumed to know the law. That's a presumption. Now, it is subject to some exceptions; that is where specific intent is an element of the charge.

"It is not necessary for the prosecution to prove that the defendant knew that a particular act, or failure to act, is a violation of law.

were dismissed, only to be recalled within minutes. The judge then restated, in a clear and concise manner, the legal proposition that for purposes of the Gun Control Act the defendant's knowledge that his acts violated the law is not a prerequisite to a guilty verdict.[2] Shortly thereafter, the jury found Cheramie guilty. Defendant contends that the first day's supplemental instruction, set out above, was prejudicial in that it threatened the jurors "that they would not be dismissed unless a verdict was returned," and coerced the jurors "to return a verdict in order to assure [their] competency to decide 'simple matters.'"

The use of a supplemental charge, usually called an Allen charge,[3] as a means of bringing about jury unanimity has met with much criticism.[4] Where the court employs such a supplemental charge, a substantial danger of prejudice results from the possibility that jurors will surrender conscientiously held beliefs in order to accommodate pressure from the bench. The pressure usually arises from the language of the charge which, among other things, may suggest that the minority should reconsider its views, that a verdict should issue within a short period of time, or even that some jurors are misbehaving

"Unless and until outweighed by the evidence in the case to the contrary, the presumption is that every person knows what the law forbids, and what the law requires to be done.

"However, evidence that the accused acted, or failed to act, because of ignorance of the law is to be considered by the jury in determining whether or not the accused acted, or failed to act, with specific intent, as charged. That's where specific intent is charged.

"In this case specific intent is not an element.

"Now, I'll tell you what 'knowingly' means.

"The purpose of adding the word 'knowingly' in the indictment is to insure that no one would be convicted of an act done because of mistake or inadvertence, or other innocent reason.

"'Unlawfully' means contrary to the law. Hence, to do an act unlawfully means to do willfully something which is contrary to law. An act is done willfully if done voluntarily and purposely.

"I don't think there is anything I can add to that.

"The jury may be excused."

2. The Court said: "I'm sorry to have inconvenienced you by having you come back in here, but I want to add one thing further to what I have said, with respect to your question.

"Title 26 of the United States Code, Section 5861, states that 'Mere possession of an unregistered firearm is a violation of the law of the United States. It is not necessary for the government to prove that the defendant knew that the weapon in his possession was a firearm within the meaning of the statute, only that he knowingly possessed it.'

"In other words, if he was conscious of having it; knew he possessed it.

"I hope that will be of some assistance. The jury may retire again."

3. Defendant variously asserts that the court submitted an "Allen-type charge" and a "capsulized Allen Charge." The supplemental "Allen" or "dynamite" charge approved in this circuit is an expansive departure from the more limited wording approved by the Supreme Court in *Allen v. United States,* 1896, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528. *See Thaggard v. United States,* 5 Cir. 1966, 354 F.2d 735, 740 (Coleman, J., specially concurring); *Huffman v. United States,* 5 Cir. 1962, 297 F.2d 754, 755–59, (Brown, C. J., dissenting). It might be argued that the terse charge objected to here is so lacking in the elements composing either the Fifth Circuit's approved version or the original "Allen" pronouncement that this Court should not subsume its analysis under the banner of the traditional "Allen" cases. For example, no reference was made by the trial judge regarding the expense of trial, or the need for minority reconsideration of their votes. While this view presents an interesting definitional question, the denomination of the charge is of only tangential importance. Instead, we look to the language employed and that language's impact, under the circumstances, on the finders of facts.

4. *See, e. g., United States v. Amaya,* 5 Cir. 1975, 509 F.2d 8; *Thaggard v. United States,* 5 Cir. 1965, 354 F.2d 735, 740 (Coleman, J., specially concurring); *Walker v. United States,* 5 Cir. 1965, 342 F.2d 22, 27 (Brown, J., dissenting); *Andrews v. United States,* 5 Cir. 1962, 309 F.2d 127, 129 (Wisdom, J., dissenting): *Huffman v. United States,* 5 Cir. 1962, 297 F.2d 754, 755 (Brown, C. J., dissenting).

by refusing to join in an otherwise unanimous decision. Notwithstanding these perils and reluctant acquiescence by some judges,[5] the present validity in the Fifth Circuit of a supplemental charge limited to the confines of previously approved language is unquestionable. *United States v. Bailey,* 5 Cir. 1973, 480 F.2d 518 (en banc), *aff'g. United States v. Bailey,* 1972, 468 F.2d 652; *United States v. Fonseca,* 5 Cir. 1971, 490 F.2d 464, 471, *cert. denied,* 419 U.S. 1072, 95 S.Ct. 660, 42 L.Ed.2d 668; *Posey v. United States,* 5 Cir. 1969, 416 F.2d 545, *cert. denied,* 397 U.S. 946, 90 S.Ct. 965, 25 L.Ed.2d 127, *reh. denied,* 397 U.S. 1031, 90 S.Ct. 1267, 25 L.Ed.2d 544. However, where the trial judge strays from these recognized parameters, this Court unflinchingly acts to correct the error.[6] *See, e. g., United States v. Amaya,* 5 Cir. 1975, 509 F.2d 8; *Powell v. United States, supra; Green v. United States,* 5 Cir. 1962, 309 F.2d 852. As we stated in *Amaya,*

> Where a charge may be plausibly read as more coercive than the standard charge we must hold that the charge was incorrectly given. . . .
> In the first part, we are unwilling to risk even a small chance of increased—and therefore immediately illegitimate—jury coercion over that which inheres in the borderline Allen charge merely for the sake of instructional novelty. In the second part, to hold otherwise would turn this Court into a psychologists' symposium with resultant great expenditures of energy and yet necessarily capricious solu-

tions. *Cf., United States v. Duke,* 5 Cir. 1974, 492 F.2d 693 at 697.

■ Scrutiny of the record in the instant case convinces us that the district court committed no error. First, unlike *Amaya, supra,* our review reveals the absence at Cheramie's trial of any improper judicially imposed time constraints.[7] In *Amaya,* the trial court told the jury to report back within an hour as to whether they were able to reach a verdict, conceivably creating among the jurors the perception that they were under a duty to agree quickly on a verdict. Later, the *Amaya* judge alluded to a trial where the jurors deliberated for nine days. We found it plausible that from this reference the jury might have inferred the threat of an undesired extended stay at the courthouse.

In the present case, the supplemental charge was pronounced only after the first day's deliberations were completed, thus avoiding any immediate time pressure. Moreover, steering clear of any *Amaya*-like suggestion that the jurors were "in for the duration," the district court judge made no mention of the amount of time that might be required to achieve a unanimous decision. His words could have given the jury no reason to believe that failure to decide swiftly would end in the court's disappropriation or that too leisurely consideration would result in lengthy jury room confinement.

Second, the court in delivering its relatively brief statement skirted what is traditionally the most troublesome fea-

---

5. *See, e. g., United States v. Bailey,* 5 Cir. 1972, 468 F.2d 652, *aff'd.,* 1973, 480 F.2d 518 (en banc) and *Thaggard v. United States,* 5 Cir. 1965, 354 F.2d 735. In *United States v. Amaya,* 5 Cir. 1975, 509 F.2d 8, 12, we said: "The Allen charge both deserves and receives a healthy disrespect in our courts."

6. This Court, pursuant to its general supervisory powers, can restrict the utilization in this Circuit of supplemental instructions more narrowly than would otherwise be required by the United States Constitution. *See United States v. Bailey,* 5 Cir. 1972, 468 F.2d 652, 668, *aff'd.,* 1973, 480 F.2d 518 (en banc). However, be-

cause this supervisory jurisdiction does not extend to state courts, we apply only the constitutional standard in habeas corpus actions arising from state criminal prosecutions. *See, e. g., Bryan v. Wainwright,* 5 Cir. 1975, 511 F.2d 644.

7. Other cases have held that the trial judge may not put the jury under any conscious, explicit time demands. *E. g., Goff v. United States,* 10 Cir. 1971, 446 F.2d 623; *Burroughs v. United States,* 10 Cir. 1966, 365 F.2d 431; *Boyett v. United States,* 5 Cir. 1931, 48 F.2d 482.

ture of the Allen charge—the exhortation to the minority to reexamine its views in the light of the majority's arguments. *See Green v. United States,* 5 Cir. 1962, 309 F.2d 852; *United States v. Rogers,* 4 Cir. 1961, 289 F.2d 433; Note, Due Process, Judicial Economy, and The Hung Jury: A Reexamination of the Allen Charge, 53 Va.L.Rev. 123, 124–27 (1967); Note, Deadlocked Juries and Dynamite: A Critical Look at the "Allen Charge." 31 U.Chi.L.Rev. 386–390 (1964).

Third, after the fact finders were told that no "other jury would be better able to understand this case," the Court prudently added an ameliorative statement, urging a decision only "if it can be done conscientiously." Not only has the former language often appeared in supplemental charges receiving this court's imprimatur, *see e. g., Sanders v. United States,* 5 Cir. 1969, 415 F.2d 621, cert. denied, 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271; *Thaggard v. United States,* 5 Cir. 1966, 354 F.2d 735; *Huffman v. United States, supra,* but also the final cautionary admonition undercuts any contention that the court wrongfully exceeded permissible limits by inducing an erroneous perception among the jurors that they had an absolute "duty to decide," *see, e. g., Jenkins v. United States,* 1965, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957, or that failure to decide would reflect unfavorably on the jury members. *See, e. g., Powell v. United States,* 5 Cir. 1961, 297 F.2d 318; *Boyett v. United States,* 5 Cir. 1931, 48 F.2d 482; *Kesley v. United States,* 5 Cir. 1931, 47 F.2d 453.

■ *United States v. Duke,* 5 Cir. 1974, 492 F.2d 693, where a coercive charge resulted in reversal, is not contrary to our holding. Unlike the present case, the trial judge in *Duke* explicitly stated that "a decision has to be reached

by a jury. You are that jury . . ." He then ineffectually attempted to dilute this particularly concentrated dose of decision-making stimulant with the impotent relaxant "it seems to me that you ought to make every effort to arrive at a unanimous verdict and to reach a conclusion." Nor do we find error in the district court's statement that the facts of the Cheramie case are relatively simple. The assertion was manifestly accurate. It was not directly addressed to the difficulty of decision making but rather to the uncomplicated nature of the evidence presented at trial, and it was followed by the ameliorative words outlined above.

■ Having reviewed the case law, we believe that the first day's supplemental charge comes within the boundaries[8] prescribed in the numerous pronouncements of this Court dealing with coercive jury charges. The judge properly exercised his discretion. He carefully avoided the pitfalls of coercive deadlines, threats of marathon deliberations, pressure for surrender of conscientiously held minority views, or any implication of a false duty to decide. So long as this Circuit, notwithstanding substantial movement in the case law away from their use,[9] continues to condone supplemental charges whose purpose is the creation of jury unanimity, we cannot say that the trial judge spoke erroneously.

Our determination that the district court acted properly need not rest on these considerations of time and language alone. Although perhaps not of sufficient probative value independently to uphold the trial judge's charge, the events of the trial's final hour reinforce our conviction that the first day's supplemental charge was not coercive. The uncontroverted facts create a strong inference that the jury's verdict resulted

---

8. We note also that the judge cautiously and explicitly avoided any inquiry regarding the numerical division among the jurors. Any such questioning would have required automatic reversal. *Brasfield v. United States,* 1926, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345; *Butler v. United States,* 5 Cir. 1958, 254 F.2d

875; *Cook v. United States,* 5 Cir. 1958, 254 F.2d 871.

9. *See generally United States v. Bailey,* 5 Cir. 1972, 468 F.2d 652, 666–69, aff'd, 1973, 480 F.2d 518 (en banc).

not from any judicially induced pressure to decide lingering on from the first day's instructions, but instead from the judge's entirely appropriate clarification of what is for lay jurors the oftentimes puzzling concept that ignorance of the law will not excuse a violation of the law.

More specifically, this conclusion is suggested by the colloquy between judge and jury on the second morning.[10] At that time, the foreman indicated to the judge that the jury was confused on the issue of legal knowledge. The apparent perplexity of some members of the jury is understandable. Defendant Cheramie was an uneducated man. The statute under which he was indicted does not specifically mention pen-guns but rather comprehends Cheramie's gun under the definition "any other weapon." 26 U.S.C. § 5845(e).[11] Given these circumstances, it would not be unusual if some of Cheramie's twelve peers, perhaps feeling that defendant's violation was innocent, that is without knowledge that the pen-gun was a legally proscribed weapon,[12] were bewildered when confronted with original instructions which, if followed, seemingly dictated a finding of guilty. The district court judge, responding directly and narrowly to the jury's probable source of confusion, explained the law.[13] He called the jury back a few minutes later to elaborate briefly on his explanation.[14] Very shortly thereafter, the defendant was found guilty. Given any reasonable reading of this record, it seems obvious that the judge's restatement of the law, and not the day earlier supplemental charge, re-

moved the jurors' doubts as to the law and culminated in a verdict.[15] Quite simply, there was not, as is characteristic of many disapproved Allen charges, a catalytic urging by the judge followed quickly by a jury decision. Rather we have a logical question, a non-coercive legal answer, and only then a verdict of guilty. There was nothing unreasonable, unfair, or unjust in these events.

## III. Defendant's Additional Contentions

 Appellant presents two additional arguments. First, Cheramie urges that the second day's instructions, set out in footnotes one and two of this opinion and discussed above, were unsolicited and "had the overall effect of directing a verdict." These contentions are patently untenable. The record plainly indicates that the jury sought the judge's remarks. Admittedly, these comments helped guide the jury to a verdict. Yet, that assistance is the purpose of jury instructions. Moreover, these additional instructions, whose use remains within the sound discretion of the court, *United States v. Gordon*, 8 Cir. 1972, 455 F.2d 398, 402, *cert. denied*, 406 U.S. 970, 92 S.Ct. 2428, 32 L.Ed.2d 670; *cf. United States v. Joyner*, 5 Cir. 1974, 494 F.2d 501, 507, *cert. denied*, 419 U.S. 995, 95 S.Ct. 308, 42 L.Ed.2d 268, correctly, and without prejudice to the defendant, reflected the state of the law. As the Supreme Court said in *Bollenbach v. United States*, 1945, 326 U.S. 607, 612–13, 66 S.Ct. 402, 405, 90 L.Ed. 350, 354, "When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy."[16] Notwith-

---

10. *See* note 1 *supra*.

11. *See* note 18 *infra*.

12. Appealing to the "spirit of the law", defense counsel had argued to the jury that "[t]he letter of the law does not say 'pen-gun' . . . . .. I submit to you that Mr. Perry Cheramie had no knowledge that this might be construed as a firearm . . . .."

13. *See* note 1 *supra*.

14. *See* note 2 *supra*.

15. Although not relying on the weight of the evidence as a factor in our decision, *see Bol-*

*lenbach v. United States*, 1945, 326 U.S. 607, 614–15, 66 S.Ct. 402, 405, 406, 90 L.Ed. 350, 355–56; *but see* Note, Due Process, Judicial Economy, and The Hung Jury: A Reexamination of the Allen Charge, 53 Va.L.Rev. 123, 133 (1967), we observe that defendant introduced no evidence to controvert the state's prior presentation with respect to all elements of the offense.

16. Defendant cites *Bollenbach* in support of his argument. *Bollenbach* is distinguishable. In that case, the judge gave a supplemental instruction which misstated the law. More-

standing our customary vigilance in the protection of an accused's right to a fair trial, where no undue pressure or inaccurate specification of the law is uncovered, we readily uphold the judge's discretion lest we discourage the use of clarifying or remedial instructions.

█ Finally, appellant asserts that the judge's examination of the government's ballistic expert exhibited the court's hostility toward appellant and implied that the pen-gun in question had been used in the perpetration of "some other crime." Reviewing the record, we encounter no hostility, nor is any called to our attention. Moreover, the right of the trial judge to interrogate a witness is firmly established. In *United States v. Hill*, 5 Cir. 1974, 496 F.2d 201, 202, we said:

It has been long recognized and frequently reaffirmed that a federal trial judge is not relegated to the position of a mere moderator, but may, by timely interventions, elicit testimony from witnesses, comment on the evidence to the jury, and limit the questioning of counsel.

█ This role was performed by the district court judge who, in the examination

tion[17] objected to by defendant, merely sought an elucidation of the meaning of "smooth bore", a term used in the statutory definition of the provision under which defendant was convicted.[18] Nothing in the exchange cited by Cheramie could reasonably lead to the inference that the gun in question had been employed in any uncharged criminal act.

Our jury system depends on the continued maintenance of the separate roles of judge and jury, out of which division lawful and responsible verdicts emerge. It is the blurring of these dual duties which we must avoid. But in preserving these respective spheres, we remember that a trial is a truth-finding tool, basic to our ordered society, and not a game of blind man's bluff. We guard against not only forced but also unintelligent jury verdicts. As such, the judge must be informative and helpful, without being oppressive or dictatorial. Here, the district court ably performed these tasks while preserving the separate sphere of action assigned to the jury. The verdict was that of Cheramie's peers; there was no surrender to an overreaching judge. We affirm the decision of the district court.

---

over, as noted above, the *Bollenbach* Court reaffirmed the trial court's responsibility to respond to the jury's confusion.

17. "Q. Now, Agent Townsend, can you explain the difference between a smooth bore and one that has rifling in it?

"A. Well, the rifling is considered as being grooves, which will affect the trajectory of a bullet, as contrasted to a smooth bore weapon. They call them lands and grooves.

"THE COURT: A smooth bore means no identifying marks on the bullet, is that right?

"THE WITNESS: That is correct.

"THE COURT: But on a rifling bore, it does leave identifying marks, is that right?

"THE WITNESS: Yes, sir.

"THE COURT: Is that how you determine whether a shot is fired from a particular gun?

"THE WITNESS: Yes, sir."

18. The Gun Control Act, 26 U.S.C. 5845(a), defines firearm as "(5) any other weapon, as defined in subsection (e) . . . .." Subsection (e) states:

(e) Any other weapon—The term "any other weapon" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition.