**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jimmy GLASS, Defendant-Appellant.**

**Nos. 82–8266, 82–8275.**

United States Court of Appeals,
Eleventh Circuit.

July 11, 1983.

Rehearing and Rehearing En Banc
Denied Sept. 22, 1983.

Theodore S. Worozbyt, Atlanta, Ga., for defendant-appellant.

Craig A. Gillen, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before HATCHETT and CLARK, Circuit Judges, and SCOTT\*, District Judge.

PER CURIAM:

Sheriff Jimmy Glass of Henry County, Georgia, appeals his conviction in the District Court for the Northern District of Georgia for conspiring to import cocaine and methaqualone into the United States in violation of 21 U.S.C.A. §§ 963[1] and 952;[2]

---

\* Honorable Charles R. Scott, U.S. District Judge for the Middle District of Florida, was a member of the panel that heard oral arguments but due to his death on May 12, 1983 did not participate in this decision. 28 U.S.C. § 46(d).

1. Title 21 U.S.C.A. § 963 states in pertinent part:

 Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

2. Title 21 U.S.C.A. § 952 states in pertinent part:

 (a) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic

for importing methaqualone in violation of § 952; for attempting to import cocaine and methaqualone in violation of § 963; for conspiring to obstruct, delay, and effect commerce through the means of extortion in violation of 18 U.S.C.A. § 1951;[3] and for two counts of obstructing and attempting to obstruct commerce through extortion in violation of § 1951. We conclude that no basis exists upon which to set aside Sheriff Glass's convictions on the above six counts; we affirm.

In spring, 1981, Larry Tew, a practicing attorney and probate judge in Henry County, Georgia, was hired to represent Ed Black and John Hathorn in a drug smuggling case. Tew began discussions with Hathorn and Black about allowing a plane loaded with drugs to land at the Berry Hill Airport in Henry County. The Berry Hill Airport was owned in part by Bill Hinton. Tew discussed the matter with Sheriff Jimmy Glass in June, 1981. Glass asked how much money they would make and indicated that some people got as much as $50,000 for doing what Tew proposed. Tew told Black and Hathorn they must pay $50,000 to land a drug plane in Henry County. Black and Hathorn agreed to pay. Sheriff Glass contacted Chief of Police Hershel Childs to discuss allowing these activities to take place in Henry County. In September, 1981, a drug shipment arrived at the Berry Hill Airport.

In September, 1981, Ron Hoover, an airplane pilot, contacted the Drug Enforcement Administration (DEA) in Greensboro, North Carolina. Hoover informed DEA that he had been approached by Ed Black, who was seeking a pilot to fly a drug shipment into Henry County. Hoover introduced Black and Tew to a Federal Bureau of Investigation (F.B.I.) undercover agent posing as an airplane pilot willing to take the assignment. Tew made an arrangement with the undercover agent to transport drugs to the Berry Hill Airport. Tew told the agent that Police Chief Childs would be present at the airport to provide him with information regarding state and federal agents in the area, and that Sheriff Glass knew what was going on, although the pilot would probably not meet him. The undercover agent and a backup undercover agent, posing as the ground crew, met with Tew and Childs to discuss the details of the drug importation. Following the meeting, Childs informed Glass that Tew had another shipment ready to be flown into the Berry Hill Airport.

The undercover agent told Tew that he would fly to the Bahama Islands and return November 3, 1981, with a load of drugs. Tew told Glass that the drug shipment was due to land on November 3. Glass warned Tew to be careful because an ex-sheriff in another county had recently been arrested on drug importation charges.

drug in schedule III, IV, or V of subchapter I of this chapter, except that—
(1) such amounts of crude opium and coca leaves as the Attorney General finds to be necessary to provide for medical, scientific, or other legitimate purposes, and
(2) such amounts of any controlled substance in schedule I or II or any narcotic drug in schedule III, IV, or V that the Attorney General finds to be necessary to provide for the medical, scientific, or other legitimate needs of the United States—
(A) during an emergency in which domestic supplies of such substance or drug are found by the Attorney General to be inadequate, or
(B) in any case in which the Attorney General finds that competition among domestic manufacturers of the controlled substance is inadequate and will not be rendered adequate by the registration of additional manufacturers under section 823 of this title, may be imported under such regulations as the Attorney General shall prescribe. No crude opium may be so imported for the purpose of manufacturing heroin or smoking opium.

3. Title 18 U.S.C.A. § 1951(a) states:
(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

On November 3, the undercover agent landed the plane at the Berry Hill Airport. Unknown to Childs, Glass, and Tew, the plane was actually loaded with suitcases filled with flour. In the presence of Childs, the plane was unloaded by the second undercover agent and the suitcases were taken to a motel room where Tew and the agent-pilot were waiting. The second undercover agent gave Tew $30,000 as payment for police protection. When Tew accepted the money, the agent arrested him. Backup agents arrested Childs.

Tew agreed to cooperate. Outside of Childs's presence, Tew admitted that he, Childs, Glass, and Bill Hinton were involved in the conspiracy. Initially, Childs denied that he or Glass were involved in the previous plane landing; eventually, however, he admitted that he and Glass were involved in the drug importation conspiracy. Tew and Childs agreed to make recorded telephone calls to Bill Hinton and Sheriff Glass for the DEA.

Tew called Hinton and made plans to deliver Hinton's share of the protection money. Childs called Glass and the following conversation was recorded:

Female voice: Hello?

Childs: Miss Martha, is the Sheriff in?

Martha: Yes, sir, hold on a second, okay?

Childs: Okay.

Glass: Hello.

Childs: Mr. Sheriff.

Glass: Yeah.

Childs: How are you?

Glass: Fine.

Childs: Good. Okay. A plane came in that I unloaded and went to Fulton County with it.

Glass: Okay.

Childs: I reckon we get our money tomorrow.

Glass: Okay.

Childs: Did everything go all right down there?

Glass: Yeah.

Childs: No problems?

Glass: Huh-uh (negative).

Childs: Alright. I will talk to you in the morning then.

Glass: Okay.

Childs: All right.

Glass: All right. Thank you.

Childs: Uh, bye.

The next morning, FBI agents arrested Sheriff Glass for conspiring to import drugs and for violations of the Hobbs Act. During a trip to Atlanta, the FBI agents asked Glass when he had last spoken with Childs. Glass denied speaking with Childs the night before.

At trial, Glass maintained that Tew and Childs had conspired against him. He contended that Tew, Childs, and the undercover agents had lied under oath. To bolster his case, Glass introduced numerous character witnesses to testify to his good character. In response, government counsel cross-examined various character witnesses concerning specific instances of Glass's conduct, specifically asking whether they were aware of an incident in which Glass supposedly "fixed" someone's traffic ticket in exchange for money. Additionally, in rebuttal, Glass's former secretary testified that she had twice received money from the mother of a defendant charged with drug violations. Each time, the money was sent in a plain white envelope. The secretary testified that in one instance she placed the money on Glass's desk; in another instance, Glass directed her to place the money in the glove compartment of his car.

The jury returned guilty verdicts against Sheriff Glass on all six counts. Glass filed a motion for acquittal which was denied. Glass also filed a motion for habeas corpus relief pursuant to 28 U.S.C.A. § 2255. The court entered judgment on the convictions and denied the motion. Glass appeals and incorporates into his criminal appeal a separate civil appeal for habeas corpus relief pursuant to § 2255.

## ISSUES

Sheriff Glass argues that the cross-examination of his character witnesses as to specific instances of misconduct, especially questions of alleged "ticket fixing," was

improper under rule 405, Federal Rules of Evidence and *Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948).

During the trial, defense counsel called many individuals, including Georgia House Speaker Thomas Murphy, and ex-United States Senator Herman Talmadge, to testify as character witnesses to Glass's good name and character. Several of the defense witnesses were cross-examined as to whether they were aware that Glass had accepted $300 to dispose of a drug case, then pending before the court.

 It is well settled that once a witness has testified concerning a defendant's good character, it is permissible during cross-examination to attempt to undermine the witness's credibility by asking that witness whether he has heard of prior misconduct on the part of the defendant inconsistent with the witness's direct testimony. *United States v. Hewitt,* 663 F.2d 1381, 1390–91 (11th Cir.1981); *United States v. Wells,* 525 F.2d 974, 976 (5th Cir.1976). *But see United States v. Duke,* 492 F.2d 693, 695 (5th Cir.1974) (prosecution may not meet defendant's reputation evidence by cross-examination directed to specific acts, but must meet reputation evidence with other reputation evidence). A trial court's discretion in admitting inquiries as to a defendant's prior misconduct is subject to two limitations: (1) the prosecutor asking the questions must have a good faith factual basis for the incidents inquired about; and (2) the incidents inquired about must be relevant to the character traits involved at trial. *Wells,* 525 F.2d at 977. In this particular instance, Glass subsequently testified that he accepted $300 from a drug defendant; therefore, the prosecution had a valid good faith factual basis upon which to determine that a possible bribe may have taken place.[4] Additionally, the prosecution's specific questions about the alleged

bribe directly relates to the character traits to which defense witnesses had testified.

The Supreme Court long ago addressed this problem. In *Michelson v. United States,* a defendant on trial for the bribery of a government agent called several character witnesses. Upon cross-examination of these witnesses, the prosecution asked whether the witnesses had heard that the defendant had previously been arrested for receiving stolen goods. Defense counsel objected to this line of questioning. The Supreme Court approved the cross examination and affirmed the conviction, noting:

> [t]he price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law had kept closed for his benefit and to make himself vulnerable where the law otherwise shields him .... [The character witness] is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions, and he may be required to disclose rumors and reports that are current even if they do not affect his own conclusions ...."

*Michelson,* 335 U.S. at 479. In bringing forth character witnesses, Glass initiated the subject of his character and good name; government counsel merely attempted to test the credibility of the witnesses by asking them about specific instances of misconduct going to the nature of their character testimony.

Additionally, rule 405(a), Fed.R.Evid., specifically allows cross-examination as to specific conduct relating to character once the issue has been addressed on direct testimony. Rule 405(a), Fed.R.Evid. provides that "[i]n all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct." Where, as here, defense counsel opened the area of charac-

---

**4.** Prior to trial, defense counsel filed a motion in limine which was granted to the extent that the government was required to proffer any extrinsic evidence to the court before bringing the matter before the jury. During the government's case in chief, no extrinsic offense evidence was introduced.

ter testimony and put Sheriff Glass's general reputation at issue, it was proper for government counsel to attempt to discern the credibility of such reputation testimony through cross-examination as to specific instances of Glass's conduct. The trial court committed no error in allowing cross-examination relating to specific acts of misconduct.

■ Sheriff Glass also uses the above argument as the basis for his contention that the trial court erred in denying his petition for habeas corpus relief pursuant to § 2255. He states that the trial court's refusal to disallow cross-examination going to specific acts of misconduct is error which should form the basis for his release from prison. In a section 2255 proceeding to vacate a district court conviction, mere error on the part of the district court is not enough to vacate a conviction. *See Bertrand v. United States*, 467 F.2d 901, 902 (5th Cir.1972). Moreover, in this case we find no error in the district court's actions. Since we find no error in allowing cross-examination as to specific acts of misconduct, the trial court did not err in denying Glass's § 2255 habeas corpus petition.

■ Next, Glass contends that in order to sustain a conviction for a violation of the Hobbs Act, 18 U.S.C.A. § 1951, there must be proof that the element of fear existed in the victim even when the extortion is under color of official right. Such a contention is meritless. Hobbs Act violations based on extortion by a public official need not include proof of threat, fear, or duress. *United States v. Williams*, 621 F.2d 123, 124 (5th Cir.1980), *cert. denied*, 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981). The coercive nature of the official office itself provides the necessary inducement, taking the place of fear, duress, or a threat. *Williams*, 621 F.2d at 124. There is no need for a showing of fear in order to sustain a conviction of extortion by a public official such as Sheriff Glass.

Finally, Glass contends that the trial court abused its discretion by not allowing into evidence surrebuttal testimony offered against the testimony of Glass's former secretary. The secretary testified that she worked for Glass during a six-month period in 1976, and that during this time she twice received money from the mother of a drug defendant to be given to Sheriff Glass. She also testified that she put an envelope containing money on Glass's desk, and on another occasion, she put money into the glove compartment of Glass's car. On cross-examination, the secretary testified that she told three other people about these incidents within the last few years. Defense counsel wished to call these individuals as witnesses for surrebuttal purposes, indicating that defense co-counsel had contacted these individuals but that none of them could recall whether the secretary had told them about the alleged bribes. The trial court responded that it had no basis upon which to consider defense counsel's motion for surrebuttal as a lack of recollection by a third party did not amount to a contention of direct misstatement on the part of the secretary. After some discussion, defense counsel submitted a formal motion for surrebuttal and the trial court denied the motion.

■ Surrebuttal testimony should go to the essence of the rebuttal testimony. *See United States v. Durnin*, 632 F.2d 1297, 1301 n. 8 (5th Cir.1980). The proffered surrebuttal testimony which defense counsel sought to introduce did not go to the essence of the secretary's testimony. Instead, it went to a side issue pertaining to whether other individuals remembered the secretary telling them the same facts she told the jury. In such an instance, the trial court did not abuse its discretion in failing to grant defense counsel's motion for surrebuttal.

CONCLUSION

We hold that the trial court did not err in allowing cross-examination as to specific acts relating to Glass's character where defense character witnesses testified as to Glass's character on direct examination; that the trial court did not err in denying Glass's § 2255 habeas corpus petition; that

the evidence is sufficient to support a conviction under the Hobbs Act for extortion performed under color of official right; and that the trial court did not abuse its discretion in denying defense counsel's motion for surrebuttal. Accordingly, we affirm Sheriff Glass's conviction on all counts.

AFFIRMED.