**Leslie LOWENFIELD,**
**Petitioner-Appellant,**

**v.**

**C. Paul PHELPS, Secretary of the Department of Corrections, State of Louisiana, et al., Respondents-Appellees.**

No. 87–3305.

United States Court of Appeals,
Fifth Circuit.

May 11, 1987.
Stay Granted June 16, 1987.
See 107 S.Ct. 3221.
Certiorari Granted in Part
June 22, 1987.
See 107 S.Ct. 3227.

Maurice N. Ross, New York City, Nancy Marshall, New Orleans, La., for petitioner-appellant.

John J. Molaison, Jr., Dorothy A. Pendergast, Asst. Dist. Attys., Research & Appeals, Gretna, La., for respondents-appellees.

Before REAVLEY, JOHNSON and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

The petitioner, Leslie Lowenfield, was convicted of the first degree murder of three persons; the court sentenced him to death on each count on the jury's recommendation. The conviction and sentence was affirmed by the Louisiana Supreme Court, *State v. Lowenfield,* 495 So.2d 1245 (La.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986). Post conviction relief was denied by the state court. *Lowenfield v. Phelps,* 497 So.2d 301 (La.1986). On Lowenfield's application for federal habeas relief, the district court stayed the execution set for November 19, 1986, so it could carefully consider the petition. Following a full evidentiary hearing, the district court denied habeas relief and vacated its earlier stay of execution; it also denied a certificate of probable cause. Lowenfield filed a notice of appeal from the district court's denial of habeas relief, and he seeks a certificate of probable cause from this court.

## I.

### FACTS

Petitioner, a native of Guyana, came to Louisiana from Canada in June 1981 and met the primary victim, Sheila Thomas, a deputy sheriff in Jefferson Parish, Louisiana, shortly thereafter. Ms. Thomas, along with her young daughter, victim Shantell Osborne, moved in with Lowenfield later in the summer of 1981. Lowenfield and Ms. Thomas lived together off and on for approximately one year. During this year, Ms. Thomas left Lowenfield on three separate occasions and returned to live with her mother. Lowenfield became increasingly bitter following each separation. When Ms. Thomas returned to her mother's home for the last time, he repeatedly threatened and harrassed Ms. Thomas and her mother, victim, Myrtle Griffin.

In the late afternoon of August 30, 1982, Owen Griffin, Sheila Thomas' stepfather, was in a vacant lot near his home in Marrero, Louisiana playing cards with friends. Owen Griffin heard shots ring out from his home, and ran to the house and rushed inside whereupon more shots rang out. When the police arrived, they found five bodies sprawled about the living area of the house; they found the bodies of Sheila Thomas, her four-year old daughter Shantell, Owen Griffin, his wife Myrtle Griffin, and Carl Osborne, the father of Shantell. All of the victims had sustained multiple gunshot wounds; each had been shot in the head at close range.

For a more detailed statement of the facts, see the Louisiana Supreme Court's decision in *State v. Lowenfield,* 495 So.2d 1245 (La.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986). We now turn to the specific issues raised by petitioner; we will discuss the facts further as needed in our discussion of these issues.

## II.

**A. Duplication of the Elements of the Underlying Crime and The Aggravating Circumstances**

Petitioner argues that the single aggravating circumstance upon which his sentence was based: knowingly creating a risk of death to more than one person, is simply a duplication of the aggravating circumstance the state was required to prove to establish his guilt of first degree murder, specific intent to kill more than one person.[1] Petitioner argues that this aggravat-

---

1. La.R.S. 14:30(3) provides:
   First degree murder is the killing of a human being:

   \*       \*       \*       \*       \*       \*

   (3) When the offender has specific intent to kill or inflict great bodily harm upon more than one person;
   La.C.Cr.P. Art. 905.4(d) provides:

ing circumstance fails to narrow the class of persons eligible for the death penalty because it does nothing more than duplicate an element of the crime. Petitioner relies primarily on *Collins v. Lockhart,* 754 F.2d 258 (8th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985). In *Collins,* the Eighth Circuit concluded that there is "no escape from the conclusion that an aggravating circumstance which merely repeats an element of the underlying crime cannot perform the narrowing function [required by the Supreme Court]." *Id.* at 264. But, we expressly rejected this analysis in *Wingo v. Blackburn,* 783 F.2d 1046, 1051 (5th Cir.1986), where we stated "we fail to see why aggravating circumstances narrow the sentencing discretion any less by being made a constituent element of the crime. The State of Louisiana is entitled to authorize capital punishment for persons guilty of these aggravated acts where the jury does not find that mitigating circumstances justify less than the death penalty." *See also Evans v. Thigpen,* 809 F.2d 239 (5th Cir. 1987); *Wilson v. Butlers,* 813 F.2d 664 (5th Cir.1987). Thus, based upon clear precedent from this circuit, we reject petitioner's arguments presented in this claim.

**B. The Trial Court's Failure to Permit Defense Counsel To Withdraw and Appoint Substitute Counsel**

■ Shortly before the trial was scheduled to begin, appointed counsel moved for permission to withdraw as counsel of record. This motion was predicated primarily on counsel's disagreement with Lowenfield over petitioner's refusal to permit them to urge insanity as a defense; the motion was also based on a letter Lowenfield sent counsel threatening them and their families.

Counsel testified at the habeas hearing that the motion to withdraw resulted primarily from their inability to persuade petitioner to urge an insanity defense. Mr. Capitelli testified that once the decision

was made to follow Lowenfield's wishes and rely on the alibi defense, his relationship with Lowenfield was good. Both counsel testified that they had little concern about the threatening letter after they learned that it was mailed from the prison where Lowenfield was confined.

The trial judge had to consider whether relieving counsel who were familiar with the facts would result in an inordinate delay of the trial and encourage similar disagreements to seek further delays. The trial judge had no reason to believe that Lowenfield would enjoy any better relationship with a new attorney.

The Supreme Court in *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), held that the determination of whether an attorney rendered effective assistance of counsel must concentrate "on the adversarial process, not on the accused's relationship with his lawyer as such." *Id.* at 657 n. 21, 104 S.Ct. at 2046 n. 21. Based upon the trial record and the testimony before the district court at the habeas hearing, we are persuaded that the adversarial process remained intact during this trial. Petitioner has not demonstrated that the trial court's denial of the motion to substitute counsel was "unreasonable and arbitrary." *Wilson v. Mintzes,* 761 F.2d 275, 287 (6th Cir.1985).

**C. Ineffective Assistance of Counsel**

Petitioner contends that his attorneys rendered ineffective assistance of counsel in both the guilt and penalty phases of his trial. We are guided by the teaching of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) on this question in which the Court established two basic requirements for finding ineffective assistance of counsel. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant

---

The following shall be considered aggravating circumstances:

\*  \*  \*  \*  \*  \*

(d) the offender knowingly created a risk of death or great bodily harm to more than one person;

must show that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. at 2064. The Court further explained that:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ... There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689, 104 S.Ct. at 2065 (citations omitted). The Court continued:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed

for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 691, 104 S.Ct. at 2066. With these principles in mind, we examine the particular claims of petitioner.

### 1. Trial Counsel's Failure to Produce Evidence of Mitigation at the Sentencing Hearing.

■ On this claim petitioner complains primarily of counsel's failure to produce evidence of Lowenfield's mental impairments at the sentencing hearing.

Before the sentencing hearing began, Lowenfield and his attorneys discussed whether they should adduce psychiatric testimony. Lowenfield was strongly opposed to it [2] and ultimately persuaded counsel that for tactical reasons this decision was sound. Counsel, at the federal habeas hearing, explained that he believed that the jury had doubts about Lowenfield's guilt that had been difficult for them to resolve. He and Lowenfield concluded that the presentation of psychiatric testimony would telegraph an admission to the jury that Lowenfield had committed the crime and remove any remaining doubts by the jurors of Lowenfield's guilt; they thought that preserving this possible doubt of guilt was more likely to benefit petitioner than psychiatric testimony. Counsel concluded that:

> [the presentation of] psychiatric [evidence] would in effect possibly be more detrimental than helpful because what would have happened would be that we'd have the one psychiatrist concerning his possibility of being insane at the time of the crime and they have three or four psychiatrists saying he was sane at the time of the crime and at that point any jurors that may have been misgiven about his guilt would no longer have those misgivings. He [Lowenfield] expressed to me he didn't want to go forward with that. The more I thought

**2.** Immediately before the sentencing hearing began, Lowenfield, outside the presence of the jury, told the court that he opposed the presentation of psychiatric testimony in this phase of the trial. Trial transcript at 2306.

about it, the more I examined it, how long the jury was out, I agreed with that. Habeas hearing record at 103.

Lowenfield's mental condition was explored as fully as possible by counsel, given petitioner's lack of cooperation. Counsel and the petitioner considered whether the psychiatrists' testimony would undermine the apparent doubt some of the jurors had of petitioner's guilt. They consciously decided that preserving the doubt of guilt would serve them better. Considering the deference we must give strategic trial decisions under *Strickland,* the failure of counsel to call a psychiatrist was not deficient performance. *Id.* at 689–91, 104 S.Ct. at 2065–66.

The only other specific complaint of substance about counsel's performance at the sentencing phase of the trial was his failure to call petitioner's relatives to testify on his behalf. The district court credited counsel's testimony that the petitioner did not wish his relatives to be present at the trial and that in any event the family members were unwilling to come to Louisiana to testify. Both of these findings are supported by evidence presented at the habeas hearing. See Habeas Hearing record at p. 111.

*Wilson v. Butler,* 813 F.2d 664 (5th Cir. 1987), relied upon by petitioner, is easily distinguished. In *Wilson,* counsel did not secure a psychiatric evaluation of his client despite signals that he was suffering from mental defects. Petitioner attached a psychiatric report to his habeas petition that supported his contention of mental defect. No other psychological evidence was in the record. Because the district court conducted no hearing, we held that the record did not "contain sufficient evidence from which the district court could determine whether Simmons [counsel] made a considered strategic decision or whether this decision was reasonable." *Id.* at 672. We remanded for an evidentiary hearing on the question of whether counsel's performance was effective including whether the decision not to produce psychiatric evidence at the sentencing hearing was a considered strategic decision.

In this case the district court conducted a full evidentiary hearing. In contrast to counsel in *Wilson,* Lowenfield's attorneys fully explained petitioner's mental condition; counsel provoked three separate sanity hearings in which a total of four psychiatrists testified after examining Lowenfield. Counsel was present when each of the psychiatrists interviewed petitioner. Counsel consulted with psychiatrist, Dr. Richard Richaux, who agreed to testify if Lowenfield agreed to permit it. Counsel consulted with Lowenfield about the desirability of presenting psychiatric testimony at the sentencing hearing and both petitioner and counsel decided against it for strategic reasons which counsel articulated in the hearing.

The record fully supports the district court's conclusion that counsel's representation of petitioner at the sentencing hearing was adequate.

## 2. Counsel's Failure to Object to the Admission of the Murder Weapons

██ Both weapons that were later established as the murder weapons were discovered by relatives of Sheila Thomas after the murders; one of Ms. Thomas' brothers discovered the rifle the next day under bed coverings on Ms. Thomas' bed while he was preparing to clean the house; another relative discovered the pistol a week later in a heater vent.

Counsel recognized that the failure of the police to discover the guns and the imperfect documentation of the chain of custody of the weapons could create problems for the state. Mr. Capitelli, lead counsel for the petitioner, testified at the habeas hearing that he was persuaded that strategically it was to Lowenfield's advantage to acquiesce in the introduction of the weapons to set the stage for an argument that others were implicated in the murders and that the sloppy police work reflected adversely on the state's entire case.[3] Giv-

---

**3.** Mr. Capitelli testifed that:

The reason why I didn't [object to the introduction of the weapons] was totally strategic, a

strategic decision I made at the time because at that point, to have objected to the guns, to have objected to the introduction of the guns

en the "wide latitude" allowed counsel by *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 in confecting trial strategy, the district court did not err in concluding that counsel did not perform ineffectively in deciding to allow the weapons to be introduced without objection.

### 3. Counsel's Failure to Properly Prepare for the Sanity Hearings

Petitioner's counsel made substantial efforts to prepare petitioner for the sanity hearing but petitioner refused to cooperate. Shortly before the trial was scheduled to begin, Lowenfield refused to be interviewed by psychiatrists. The district court, after hearing testimony from counsel and from Lowenfield, did not err in concluding that counsel made reasonable efforts to prepare Lowenfield for his sanity hearing, and to persuade him to cooperate; Lowenfield adamantly refused to do so. The district court correctly found no ineffective assistance of counsel in this respect.

### 4. Counsel's Failure to Investigate the Insanity Defense and to Present this Defense at Trial

This argument is meritless for two reasons. First, the available evidence would hardly have supported a vigorous insanity defense. Three sanity commissions found that Lowenfield was sane with only a single dissenting psychiatrist, Dr. Richaux. At the third sanity hearing Dr. Richaux admitted that he did not have "a definitive opinion concerning Mr. Lowenfield's sanity at the time of the offense," but he expressed his tentative opinion that "there is a good possibility that Mr. Lowenfield could have been psychotic" at that time. According to Mr. Capitelli's testimony at the federal habeas hearing, Dr. Richaux was the only psychiatrist who was able to give favorable testimony on the issue of Lowenfield's insanity defense, and his testimony would have likely been rebutted by the remaining psychiatrists from the insan-

ity commission who believed that Lowenfield was sane at the time of the offense.

Second, Lowenfield's refusal to agree to the assertion of an insanity defense precluded counsel from obtaining more evidence. Lowenfield simply would not talk about the insanity defense. He refused to be interviewed by any more psychiatrists, and he would not submit to the psychiatric tests his attorneys had set up for him. Considering the paucity of available evidence to support an insanity defense and Lowenfield's refusal to cooperate in the search for additional evidence, we find no error in the district court's conclusion that counsel was not unreasonable in following their client's instructions and asserting an alibi defense.

■ We also reject the contention that counsel should have simultaneously asserted at trial both an alibi defense and an insanity defense. We agree with the district court that "this would have caused complete chaos at trial: on one side of the defense table, counsel would have been arguing an insanity defense, while on the other side of the table petitioner would be seeking to take the stand in support of his alibi defense." Lowenfield repeatedly insisted that his attorneys should present an alibi defense and not an insanity defense. Lowenfield's directions were entitled to be followed. The circumstances are extremely rare when counsel is not required to follow his client's instructions on a decision of this nature. *See Autry v. McKaskle,* 727 F.2d 358, 361 (5th Cir.1984) (attorney's conduct was not constitutionally deficient when he acceded to client's preference for the death penalty over a long prison term). This is not one of those rare cases.

Our reading of this record persuades us that Lowenfield received a vigorous defense. Lead counsel, Mr. Capitelli, had worked as a chief assistant district attorney in Orleans Parish, Louisiana, before

would have given the prosecutors the chance to argue at the closing phase, Mr. Capitelli wants to use these guns to point at a possible implication of other individuals, yet if you recall, he objected strenuously to the introduction of these guns, and that was one of the ma-

jor considerations I felt, in retrospect and at the time that the guns involved were one of the strongest things we could point to to shift the light off of Leslie.
Habeas Hearing record at 109.

engaging in private practice and had been involved in forty to fifty capital cases. Our review of this record reveals no failure in the adversary process.

## D. Coercion of a Deadlocked Jury Into a Verdict

The jury was charged following the guilt phase of the trial on May 14, 1984 at 11:45 a.m.; they deliberated until 7:45 p.m. when the trial court recessed for the night at the jury's request. The jury resumed its deliberations the next day at 10:05 a.m., and returned with its guilty verdicts at 3:05 p.m.

The sentencing hearing, according to Judge Cannella, commenced three hours later, at 6:05 p.m., and concluded at 8:17 p.m. Following the sentencing hearing, the jury deliberated until 11:55 p.m., at which time the trial court recessed for the night at the jury's request. The jury reconvened the next day, May 16, 1984, at 9:40 a.m. Two hours later defense counsel moved for a mistrial arguing that the elapsed deliberation time, five hours, and the last instruction by Judge Cannella at the guilt phase, justified a mistrial.[4] Approximately three hours later, counsel reurged their motion. While counsel were arguing their motion for mistrial, the trial judge received a note from the jury indicating that it was deadlocked. The trial court then polled the jury and asked them "do you feel that any further deliberations will enable you to arrive at a verdict?" One juror responded negatively; the balance of the jury answered the question affirmatively. The court instructed the jury to continue its deliberations and repeated parts of its earlier charge, including the statement that if they were unable to reach a verdict, the court would sentence the petitioner to life imprisonment.[5] Thirty minutes later the jury returned its verdict.

The trial judge must enjoy wide discretion in determining when to declare a mistrial on grounds of a deadlocked jury. *Monroe v. Blackburn,* 748 F.2d 958, 961 (5th Cir.1984). To amount to a constitutional deprivation, the trial judge's action must constitute coercion that denies the accused a fundamentally fair trial. *Bryan v. Wainwright,* 511 F.2d 644, 646 (5th Cir. 1975).

Our review of this record leads us to agree with the district court that there is no showing of coercion; the record certainly does not demonstrate coercion sufficient to render the trial fundamentally unfair. The jury deliberated thirteen hours before reaching a verdict in the guilt phase and nine and one-half hours before reaching a verdict in the penalty phase. Petitioner

---

4. The supplemental instruction provided:

   Let me say that I know how much effort you've put into the case already. I know you put a lot of effort into deliberation and I appreciate the effort you put in.

   In this note you request certain items. I cannot give the evidence that you requested. There are legal reasons why I cannot give you the evidence. You must rely on your memories on what the evidence, on what evidence you saw and you heard when you were in court. The fact that certain items cannot by law be given to you you [sic] should not hold against either the state or the defendant in this case.

   Since I've told you now that I cannot give you these items I order you to go back to the jury room and to deliberate and arrive at a verdict.

   Trial transcript at 2299.

5. The Court instructed the jury:

   Ladies and Gentlemen, as I instructed you earlier if the jury is unable to unanimously agree on a recommendation the Court shall impose the sentence of Life Imprisonment without benefit of Probation, Parole, or Suspension of Sentence.

   When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.

   Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

   Ladies and Gentlemen please retire to the jury room.

   Trial transcript at 2350–51.

does not challenge either supplemental instruction the court gave the jury, and we see nothing about those instructions that can be characterized as coercive. The trial court did not deprive petitioner of a fundamentally fair trial by allowing the jury to deliberate for thirteen hours on the guilt phase and nine and one-half hours on the penalty phase. This claim has no merit.

**E. Louisiana Improperly Shifted the Burden to Petitioner to Prove his Competence, Improperly Relieved the State of its Burden to Prove Petitioner's Competency and Improperly Refused to Appoint a Psychiatrist to Assist in Presenting an Insanity Defense at Trial.**

■ Lowenfield next argues that he was impermissibly required to carry the burden of proof that he was incompetent to stand trial. Louisiana law presumes the defendant's sanity. La.R.S. 15:432. The defendant carries the burden of proving by a clear preponderance of the evidence that as a result of a mental disease or defect he lacks the capacity to understand the proceedings against him or to assist in his defense. La.C.Cr.P. Art. 641. *State v. Machon*, 410 So.2d 1065 (La.1982). Lowenfield argues that this statutory scheme violates the due process clause of the fourteenth amendment. We disagree.

■ Lowenfield principally relies on *United States ex rel. Bilyew v. Franzen*, 686 F.2d 1238 (7th Cir.1982). *Bilyew* involved a state murder conviction under an Illinois statute that placed the burden on the defendant to prove his incompetency to stand trial. *Id.* at 1238. The Illinois Supreme Court upheld the conviction despite its own intervening decision that the statute's apportionment of the burden of proof was unconstitutional. *Id.* at 1244. The district court denied the defendant's petition for habeas corpus and held that any error in misallocating the burden of proof was harmless regardless of whether the statute was unconstitutional. *Id.* at 1244. The Seventh Circuit reversed and held that the error of misallocating the burden of proof was not harmless because "the evi-

dence was very close" and there was a "reasonable possibility" that the defendant would have been found incompetent to stand trial if the state were required to carry the burden of proof. *Id.* at 1246.

Lowenfield relies on *Bilyew's* statement that "the Fourteenth Amendment requires the State or federal prosecution to shoulder the burden of proving that the defendant is fit to stand trial once the issue of unfitness has been properly raised." *Id.* at 1244. No circuit court has followed this rule, and we refuse to follow it for several reasons. First, *Bilyew's* conclusion that a state may not constitutionally place the burden of proving incompetency on the defendant merely echoes the opinion of the Illinois Supreme Court.

Second, in declaring that both state and federal prosecutors are required to shoulder the burden of proving competency, we believe *Bilyew* confused the requirements imposed upon federal prosecutors by federal statute with the latitude ordinarily accorded state legislatures under state law to decide the placement of the burden of proof. There is no question that in federal prosecutions, the government bears the burden of proving the defendant's competence to stand trial by a preponderance of the evidence. 18 U.S.C. § 4241. *See United States v. DiGilio*, 538 F.2d 972, 988 (3d Cir.1976), *cert denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749; *United States v. Makris*, 535 F.2d 899, 906 (5th Cir.1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803. Nevertheless, *Bilyew* cites *DiGilio* and *Makris* for the proposition that state prosecutors likewise bear the burden of proving competency. Both *DiGilio* and *Makris* were decided under the federal criminal statute for determining competency, however, and they have no applicability to the state's latitude to determine burdens of proof in an orderly fashion. We see no reason why Louisiana should be prohibited from placing the burden of proving incompetency on the defendant merely because Congress chose to place that burden on the government in federal prosecutions.

Third, even if *Bilyew* was correct that federal due process prohibits the allocation of the burden of proof to the defendant on this issue, the determination in the instant case is harmless error. Notably, the trial court never relied on the presumption in finding that Lowenfield was competent to stand trial. Furthermore, the evidence strongly supports the court's determination that Lowenfield was competent to stand trial, and there is no reasonable probability that a different burden of proof would have made a difference. The test of competency has long been established by the Supreme Court as whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 788, 4 L.Ed.2d 824 (1960). The evidence of Lowenfield's competence to stand trial satisfies both *Dusky* and the similar test under Louisiana law announced in *State v. Bennett*, 345 So.2d 1129, 1138 (La.1977). Lowenfield exhibited his ability to make important decisions by rejecting the use of the insanity defense in a reasoned manner.[6] The record reflects that Lowenfield also took notes during the course of the trial in order to assist his trial counsel. He also furnished names and addresses of alibi witnesses in Florida. Most importantly, none of the doctors on the sanity commission identified a mental disease or defect which could form the basis of a finding of incompetency. The psychiatrists on the three sanity commissions were unanimous in their opinion that Lowenfield was competent to stand trial, with the sole exception of Dr. Richaux whose determination was based on the problems associated with Lowenfield's belief that his attorneys were in a conspiracy against him, rather than the existence of any mental disease or defect.

Any right to a psychiatrist to assist in the presentation of the defense became moot after petitioner voluntarily withdrew his insanity defense. The only issue at trial became whether petitioner was in the vicinity of New Orleans, Louisiana on the date of the crime and not whether he suffered from mental deficiencies. The district court correctly rejected petitioner's claims for habeas relief predicated on these grounds.

Petitioner also contends that counsel had no opportunity to present psychiatric testimony in the sentencing hearing because the court only allowed a short recess after the guilty verdict was rendered and before the sentencing hearing began. As discussed earlier, Lowenfield and counsel made a considered decision not to present psychiatric testimony and petitioner did not ask the trial court for a further recess within which to obtain psychiatric testimony. This argument also has no merit.

**F. Arbitrary Factors Introduced at the Sentencing Hearing in Violation of the Eighth and Fourteenth Amendments**

Petitioner first argues that the admission of a bill of information filed more than a month after Ms. Thomas' death charging petitioner with making harassing phone calls is an arbitrary factor that requires issuance of the writ. The bill of information was offered by the state to show the presence of the second aggravating circumstance: that one of the victims was a witness in a prosecution against the petitioner. The Louisiana Supreme Court held that the state failed to establish this aggravating factor because the bill of information was not pending at the time of

---

6. The defendant testified:

... I plead not guilty and my reason for pleading not guilty is that I wasn't in the State of Louisiana in August ... August 30, 1982, the day I was accused of a crime.... I wished not to plead not guilty by reason of insanity because reason of insanity is telling the court that this person did something he wasn't responsible for something. And to the best of my knowledge I never had no mental illness in my whole entire life and up to this moment I do not have any mental problems. And I advised him to withdraw the plea because its telling, you're telling the court plainly to plead reasonable insanity. You're looking for a way out....

Trial transcript at 851–52.

Ms. Thomas' murder. The Louisiana Supreme Court also determined that the trial court erred in admitting this bill of information but concluded that "[g]iven the overwhelming enormity of defendant's crime, it is inconceivable the additional evidence that the defendant was charged with making harassing phone calls could have prejudiced defendant." *State v. Lowenfield,* 495 So.2d 1245, 1258 (La.1985). In order to rise to constitutional proportions, a violation of state evidentiary rules must be of such a magnitude that it constitutes a denial of fundamental fairness. *Cronnon v. Alabama,* 587 F.2d 246, 250 (5th Cir.), *cert. denied,* 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 792 (1974). Given the relative insignificance of this item of evidence in the prosecution of a crime as heinous as this, we agree with the Louisiana Supreme Court that it was not prejudicial; its admission certainly does not rise to the level of a denial of fundamental fairness.

Petitioner's second evidentiary point is also meritless. Petitioner complains of the introduction, during the sentencing hearing, of evidence of his conviction of attempted rape in Canada. He complains that no showing was made that the defendant was afforded all of the constitutional protection in the Canadian case to which he would otherwise be entitled under United States law. *Lewis v. United States,* 445 U.S. 55, 57, 100 S.Ct. 915, 916, 63 L.Ed.2d 198 (1980). But, this is not the standard that applies to a sentencing hearing in a capital case.

■■■■■ In *Mattheson v. Maggio,* 714 F.2d 362, 365 (5th Cir.1983), we made it clear that a habeas petitioner has the burden of proving that convictions used by the state in a sentencing hearing to illustrate the petitioner's character propensities were constitutionally defective. A trial court has broad discretion in the sentencing phase of a capital case to permit the jury to receive relevant information that will assist them in predicting the future behavior of the accused. *See Milton v. Procunier,* 744 F.2d 1091, 1097 (5th Cir.1984).

## G. Change of Venue

■■■■■ Petitioner argues that the trial court erred in denying his motion for a change in venue predicated on two arguments: pretrial publicity and the close working relationship between the victim, Sheila Thomas, and judges of the court in which petitioner was tried.

The evidentiary hearing conducted by the district court fully supports the district court's finding that the trial judge, Judge Canella, was not personally acquainted with Sheila Thomas or her family and became aware that she had apparently escorted prisoners to his courtroom only after the trial proceedings in this case had begun. Ms. Thomas was one of fifteen or twenty deputies who transported prisoners to all fifteen divisions of the 24th Judicial District Court. After her death, Judge Canella recalled having seen Ms. Thomas in his courtroom but did not recall ever speaking with her. The evidence also supported the finding that the relationship between Judge Canella and Judge Collins, who did know the victim and her family, would not prevent Judge Canella from impartially trying petitioner's case. The only contact Judge Canella had with Judge Collins about this case was on the eve of one of the hearings on petitioner's motion for change of venue; Judge Canella asked Judge Collins about the procedure he followed in handling a similar motion. This limited contact is insufficient to call Judge Canella's impartiality into question.

We also agree with the district court that petitioner has had a full and fair opportunity to establish prejudice from pretrial publicity. *See Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

The transcript of the voir dire examination occupies several hundred pages; counsel were given wide latitude in conducting their examination. Of the jurors selected, only four recalled having heard about the case. They all verified that they could sit as a fair and impartial juror on petitioner's case.

The record in this case does not support imposition of the rule announced in *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417,

10 L.Ed.2d 663 (1963), that requires a court to presume the jury venire was prejudiced against petitioner. As we stated in *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981):

> The principle distilled from this holding [Rideau] by courts subsequently discussing the case is that where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, "[jury] prejudice is presumed and there is no further duty to establish bias."

The pretrial publicity in this case does not approach the level required to impose the *Rideau* rule.

Petitioner points to no evidence in the record and our review of it has disclosed none that would demonstrate the "actual identifiable prejudice" from the pretrial publicity required to warrant issuance of the writ. *Mayola*, 623 F.2d at 996.

With respect to claimed imperfections of several of the jurors actually chosen, we fully agree with the district court's reasons for rejecting petitioner's arguments and adopt those reasons as our own.

#### H. Identification Testimony of Diane Faucheux

Lowenfield argues that the identification testimony by cab driver Diane Faucheux should have been suppressed because it was made as a result of "unduly suggestive tactics" by the police. A detective who knew that Lowenfield frequently used cabs showed Lowenfield's picture to various cab drivers, including Ms. Faucheux, at the Westbank Cab Company. Ms. Faucheux, at that time, failed to identify Lowenfield as one of her passengers. Having failed to obtain an identification, the detective reviewed the taxi logs and discovered that Ms. Faucheux had picked up a fare at the petitioner's apartment on the day of the murders. The detective again asked Ms. Faucheux if she recognized Lowenfield's photograph. After being shown the log and Lowenfield's photographs, Ms. Faucheux positively identified Lowenfield as the fare she delivered one block from the murder scene; she also recalled that Lowenfield spoke with an accent. The officer then left and gave Ms. Faucheux a picture of Lowenfield with instructions to contact the police if she saw him again.

Ms. Faucheux testified that she was able to identify Lowenfield because she looked at his face when she helped him load and unload packages from the cab. Additionally, she conversed with him during the hour long ride and as a result frequently looked back in the mirror. She also got a good look at his face when he paid the fare.

Petitioner argues that the actions of the detective in showing Ms. Faucheux the single photograph of Lowenfield on two occasions was unduly suggestive. The key factor in determining the admissibility of identification testimony is whether, under the totality of the circumstances, the identification was reliable. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Stovall v. Denoe*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). In *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), the Supreme Court established that "convictions based on eyewitness identification at trial following pretrial identification by photographs will be set aside on that ground only if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *See also Nettles v. Wainwright*, 677 F.2d 410, 414 (5th Cir.1982).

The only suggestive indicia that tends to undermine Ms. Faucheux' identification is the act of the police in showing her a solitary picture and allowing her to keep a copy. But we conclude that this alone is not sufficient to create a "very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384, 88 S.Ct. at 971. Because of Ms. Faucheux' close contact with Lowenfield for approximately an hour during which time she observed him closely on several occasions and heard him speak in his distinctive accent,

we conclude that the "identification was encompassed by indicia of reliability." *Nettles v. Wainwright*, 677 F.2d 410, 414 (5th Cir.1982). This claim is meritless.

## III

▮▮▮ Lowenfield also argues that: (1) the trial court's jury instructions on circumstantial evidence and the burden of proof were erroneous, (2) the trial court's refusal to permit petitioner to recall Anita Jackson to the stand violated petitioner's rights under the sixth and fourteenth amendments, (3) the evidence was insufficient for the jury to find petitioner guilty beyond a reasonable doubt, (4) electrocution is a cruel and unusual means of punishment, (5) capital punishment is an excessive penalty, (6) the cumulative effect of the violation of petitioner's rights constitutes a violation of petitioner's Constitutional rights. We agree with the district court that all of these claims lack merit. We adopt the opinion of the district court on these issues and append to this opinion the relevant portion of the district court opinion.

In conclusion, because Lowenfield has not made a substantial showing of the denial of a federal right, we DENY a certificate of probable cause and also DENY a stay of execution. *See Barefoot v. Estelle*, 463 U.S. 880, 883, 103 S.Ct. 3383, 3389, 77 L.Ed.2d 1090 (1983). The mandate shall issue forthwith.

## APPENDIX

Excerpts from opinion of United States District Court, Eastern District of Louisiana, dated March 31, 1987, in Civil Action No. 86–5036, Section M (1).

## V.

\* \* \*

Regarding the imperfections of the jurors actually chosen, this court read those applicable portions of the transcripts. Four of the jurors had heard about the case on the news. As discussed above, this, alone, means little, and Petitioner takes it no further. One of the jurors questioned his ability to sit through the whole trial and be fair-minded. However, this statement was made in the context of concern for his wife and new baby; he was worried about leaving them alone. His concern did not relate to this case as such, and once his concerns over his family were addressed, he agreed that he held no preconceptions. He was not challenged. However, one juror, Catherine Roberts, expressed an inability to not consider Petitioner's not taking the stand:

> MS. ROBERTS: ... I know right now the idea of his not being up there, I know if I'm thinking now I'm sure it might happen.
> MR. CAPITELLI: ... I need to know the answer now. I'm not going to get a chance to do it later. If it is causing you concern now, I need to ask you to articulate it in terms of would that effect in your mind concern you to the point you could not be totally fair?
> MS. ROBERTS: Yes.

Transcript, 9 May 1984, at 168. Ms. Roberts was asked a few more unrelated questions. She was not challenged. Petitioner apparently felt that she was a good juror for his cause. It may have been the way she looked, her religious affiliation (Luteran (sic)), or something else. In any event, Petitioner was satisfied with her. Further, Petitioner *did* take the stand, so Ms. Roberts's reservations were mooted.

\* \* \*

*Claim 8 The Trial Court's Jury Instructions Concerning the Use of Circumstantial Evidence at the Guilt Phase of the Trial*

Petitioner's eighth claim questions the validity of the trial court's jury instruction concerning criminal convictions based on circumstantial evidence. Petitioner contends that pursuant to La.Rev.Stat.Ann. § 15:438, the trial court should have made it clear to the jury that a conviction based on circumstantial evidence must "exclude every reasonable hypothesis of innocence." Petitioner concedes that the desired charge was eventually given; however, he asserts that intervening instructions confused the jury. Pet.Br. at 89–90.

The State contends that no objection was lodged at trial and that Petitioner is barred from raising the issue before this Court. However, regardless of the State's contentions, Petitioner's arguments stressed in Claim 8 are without merit. The trial court instructed the jury that guilt had to be found beyond a reasonable doubt. The court also gave the charge implicit in La. Rev.Stat.Ann. § 15:438. Moreover, review of the record indicates that the charges, taken in their entirety, were not confusing. Petitioner's eighth claim is without merit.

\* \* \*

*Claim 11 The Trial Court's Refusal to Permit Petitioner to Recall Anita Jackson to the Stand*

Petitioner's eleventh claim centers on whether the trial court erred in denying counsel's request to recall Anita Jackson to the stand. Petitioner contends that said denial was in violation of his sixth amendment and fourteenth amendment rights. Pet.Br. at 112.

Pet. is undisputed that Ms. Jackson was not a surprise witness in the case. Petitioner's counsel knew that Ms. Jackson would testify and was actually given copies of statements that Petitioner's counsel used to conduct its cross-examination of Ms. Jackson. See Trial Trans. Vol. VIII at 1944–1960; Pet.Exh. C. at 53. The trial court's denial of counsel's request did not abridge Petitioner's constitutional rights. Petitioner's eleventh claim is without merit.

*Claim 12 The Sufficiency of the Evidence for Proving Petitioner's Guilt Beyond a Reasonable Doubt*

Petitioner's twelfth claim contends that since his conviction was based on circumstantial evidence, there exists a "real and substantial doubt" concerning his guilt. Following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Louisiana Supreme Court rejected this same contention in the course of its careful review. See Pet.Br.Exh. C. at 54–56. The review by the Louisiana Supreme Court comported with the guidelines set forth in *Jackson*. Further, the record contains a sufficient basis for "a rational factfinder ... [to] have found the petitioner guilty

beyond a reasonable doubt...." *Jackson*, 443 U.S. at 325, 99 S.Ct. at 2792. Petitioner's twelfth claim is without merit.

\* \* \*

*Claim 14 Electrocution as a Means of Punishment*

Petitioner's fourteenth claim avers that death by electrocution constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution. Pet.Br. at 114. Death by electrocution does not constitute cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *State v. Myles*, 389 So.2d 12 (La.1980). Petitioner's fourteenth claim is without merit.

*Claim 15 Capital Punishment as an Excessive Penalty*

Petitioner's fifteenth claim contends that capital punishment is an excessive penalty. As discussed under Claim 15, capital punishment is not an excessive penalty, per se, and capital punishment is not an excessive penalty within the confines of the present case. Petitioner's fifteenth claim is without merit.

*Claim 16 Petitioner's Alleged Cumulative Violations as a Source of Constitutional Infringement*

Petitioner's final argument asserts that the cumulative effect of the alleged infringements are violative of his constitutional rights. The Court has found that the arguments put forth in each of Petitioner's first fifteen claims do not, independently, mount a constitutional challenge by which this Court could set aside his conviction or sentence. This Court also finds that the collective allegations do not present a constitutional abridgment warranting action by this Court. Petitioner's sixteenth claim is without merit.

JOHNSON, Circuit Judge, dissenting:

The supplemental *Allen* charge urging the jury to reach a verdict and the *Brasfield* inquiry into the jury's numerical division have no place in the sentencing phase of a death penalty case. A jury considering whether to impose a life or death sen-

tence is likely to interpret these actions of the judge as a suggestion or command to choose death. With great deference to the opinion of the majority, I therefore respectfully dissent.

### A.

The *Allen* charge, deriving its name from *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), refers to "supplemental instructions urging a jury to forego their differences and come to a unanimous decision."[1] The charge, so often criticized for its coercive tendencies,[2] has been upheld[3] as not per se unconstitutional in the usual criminal case.[4] Nevertheless, the appellate court must scrutinize[5] an *Allen* charge for compliance with "two requirements": "(1) the semantic deviation from approved '*Allen*' charges cannot be so prejudicial to the defendant as to require reversal, and (2) the circumstances surrounding the giving of an approved '*Allen*' charge must not be coercive."[6] We proceed on a case by case basis[7] under a

totality of the circumstances test.[8] The "potential for coercion is present in even the most mild supplemental instructions,"[9] and an *Allen* charge wholly unobjectionable in its content may nonetheless be coercive in light of the circumstances under which it was given.[10] Finally, although we should not grant habeas corpus relief to a state defendant merely because the state trial court made minor deviations from approved *Allen* charges,[11] the defendant may show in federal habeas corpus proceedings that the charge was unconstitutionally coercive[12] under the totality of the circumstances.[13]

Trial judge inquiry into the numerical division of the jury is similarly coercive. In *Brasfield v. United States,* 272 U.S. 448, 449–50, 47 S.Ct. 135, 135–36, 71 L.Ed. 345 (1926), the Supreme Court condemned this practice as a ground for reversal. In *Brasfield,* the practice was condemned, even though the jury had not revealed "which number favored a conviction." A *Bras-*

1. *United States v. Bottom,* 638 F.2d 781, 786 n. 4 (5th Cir.1981); *see also United States v. Taylor,* 530 F.2d 49, 51 n. 5 (5th Cir.1976) ("The term 'Allen Charge' is commonly used to refer to supplemental charges given to deadlocked juries encouraging jurors to reconsider their position").

2. *E.g., United States v. Blevinal,* 607 F.2d 1124, 1128–29 (5th Cir.1979) (Godbold, J., dissenting), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980); *United States v. Amaya,* 509 F.2d 8, 12–13 (5th Cir.1975), *cert. denied,* 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551 (1977); *United States v. Vigo,* 435 F.2d 1347, 1350 (5th Cir.1970), *cert. denied,* 403 U.S. 908, 91 S.Ct. 2214, 29 L.Ed.2d 684 (1971); *Thaggard v. United States,* 354 F.2d 735, 739–41 (5th Cir.1965) (Coleman, J., concurring), *cert. denied,* 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301 (1966); *Walker v. United States,* 342 F.2d 22, 27–29 (5th Cir.) (Brown, J., dissenting), *cert. denied,* 382 U.S. 859, 86 S.Ct. 117, 15 L.Ed.2d 97 (1965); *Green v. United States,* 309 F.2d 852, 854–56 (5th Cir. 1962); *Andrews v. United States,* 309 F.2d 127, 129–30 (5th Cir.1962) (Wisdom, J., dissenting), *cert. denied,* 372 U.S. 946, 83 S.Ct. 939, 9 L.Ed.2d 970 (1963); *Huffman v. United States,* 297 F.2d 754, 755–59 (5th Cir.) (Brown, J., dissenting), *cert. denied,* 370 U.S. 955, 82 S.Ct. 1605, 8 L.Ed.2d 820 (1962).

3. *United States v. Bailey,* 480 F.2d 518, 518 (5th Cir.1973) (en banc).

4. *See Bailey,* 480 F.2d at 520 (Goldberg, J., concurring in part and dissenting in part).

5. *Blevinal,* 607 F.2d at 1126.

6. *Bottom,* 638 F.2d at 787; *see also United States v. Cheramie,* 520 F.2d 325, 328 (5th Cir.1975).

7. *United States v. Kimmel,* 777 F.2d 290, 294 (5th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1947, 90 L.Ed.2d 357 (1986).

8. *United States v. Fossler,* 597 F.2d 478, 484–85 (5th Cir.1979).

9. *Blevinal,* 607 F.2d at 1126.

10. *Fossler,* 597 F.2d at 483–85; *United States v. Williams,* 447 F.2d 894, 899–900 (5th Cir.1971).

11. *See Cheramie,* 520 F.2d at 330 n. 6.

12. *Bryan v. Wainwright,* 511 F.2d 644, 646 (5th Cir.), *cert. denied,* 423 U.S. 837, 96 S.Ct. 63, 46 L.Ed.2d 55 (1975).

13. The majority opinion suggests that Lowenfield has not challenged the *Allen* charge. *Supra* at 293–94. Though he has not explicitly challenged the wording of the *Allen* charge, Lowenfield does contend that the circumstances at sentencing, including the fact that an *Allen* charge was given, show that the jury was coerced. Petitioner's Memorandum of Law at 29–33.

*field* inquiry, especially in conjunction with an *Allen* charge, requires reversal.[14] Debate has been sparked elsewhere over the question whether the *Brasfield* inquiry alone is a ground for relief in a federal habeas corpus proceeding.[15] At the very least, however, the presence of a *Brasfield* inquiry tends to show unconstitutional coercion under the totality of the circumstances.[16]

**B.**

The "effect upon a divided jury" of an *Allen* charge or *Brasfield* inquiry "will often depend upon circumstances which cannot properly be known to the trial judge or to the appellate courts."[17] We cannot enter the jury room during deliberations; we cannot see into the mind of the deliberating juror. Thus, when we examine a case and test it for trial judge coercion of the jury under the totality of the circumstances, we must resort to reasonable inference and supposition.[18]

In the present case, the jury deliberated some thirteen hours in the guilt-innocence phase. The jury began deliberating in the guilt-innocence phase on May 14, 1984. After further deliberations on May 15, 1984, the jury reached its verdict at 3:05 p.m. in this phase of the trial. That same day, May 15, 1984, at 6:05 p.m., over defense counsel objection,[19] the trial judge began the sentencing phase of trial. He conducted the sentencing hearing, instructed the jury on sentencing, and directed the jury to begin deliberating on the question of life or death. Deliberations began at 8:17 p.m. After deliberating until 11:55 p.m. that eve-

ning, the jury complained that it was hungry and tired and that it had already come up with one verdict that day.[20] Only then did the trial judge recess for the night. The next day, May 16, 1984, at 9:40 a.m., the jury continued deliberating. It continued its deliberations for more than five hours before telling the trial judge, in a note, that it was unable to agree upon a recommendation.

In his initial sentencing charge to the jury, the trial judge had explained that, in accordance with article 905.8 of the Louisiana Code of Criminal Procedure, if "the jury is unable to unanimously agree on a recommendation, the court shall impose a sentence of life imprisonment without benefit of probation, parole or suspension of sentence."[21] Nevertheless, upon the jury's representation of deadlock in its note to the judge, the trial judge for the first time declined to invoke the article 905.8 procedure. Instead, the judge had the jury return to the courtroom and instructed it again on the article 905.8 procedure. The judge then asked the jury "if further deliberations would be helpful in obtaining a verdict." The judge determined that four jurors felt further deliberations would not be helpful; eight jurors stated that further deliberations would be helpful. For the second time, the judge declined to accept the deadlock and apply the article 905.8 procedure. The judge then, purporting to rephrase the question, determined to ask the same question again. He asked, "Do you feel that any further deliberations will enable you to arrive at a verdict?" This

**14.** *United States v. Chanya,* 700 F.2d 192, 193–94 (5th Cir.1983), *cert. denied,* 466 U.S. 943, 104 S.Ct. 1925, 80 L.Ed.2d 471 (1984); *Cheramie,* 520 F.2d at 331 n. 8; *United States v. Hayes,* 446 F.2d 309, 312 (5th Cir.1971); *Cook v. United States,* 254 F.2d 871, 873–75 (5th Cir.1958).

**15.** *Compare, e.g., Ellis v. Reed,* 596 F.2d 1195, 1197 (4th Cir.), *cert. denied,* 444 U.S. 973, 100 S.Ct. 468, 62 L.Ed.2d 388 (1979), *with id.* at 1201–02 (Winter, J., dissenting).

**16.** *Ellis,* 596 F.2d at 1200; *Jones v. Norvell,* 472 F.2d 1185, 1185–86 (6th Cir.), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2275, 36 L.Ed.2d 964 (1973).

**17.** *Brasfield,* 272 U.S. at 450, 47 S.Ct. at 135–36.

**18.** *See Cheramie,* 520 F.2d at 331–32; *Amaya,* 509 F.2d at 12–13; *Williams,* 447 F.2d at 900.

**19.** "I request a twenty-four to forty-eight hour delay for purposes to give them time to cool, the jury to cool from the verdict and also in preparation."

**20.** "I think what's happening, Your Honor, is the jury is tired. We've come up with one verdict. We haven't eaten since noon by our own choice and the group is getting quite tired."

**21.** La.Code Crim.Proc.Ann. art. 905.8 (West 1984).

time, eleven jurors answered yes; one juror, however, persisted in saying that further deliberations would not be helpful. For the third time, the judge declined to accept the deadlock. Instead, he gave the *Allen* charge, urging the jurors "to reexamine your own views and to change your opinion if you are convinced you are wrong" "with the objective of reaching a just verdict," and directed further deliberations. Within thirty minutes, the jury returned a verdict recommending death.

This sequence of events gives rise to a strong inference of coercion at the sentencing phase of trial. Taking the guilt-innocence and sentencing phases together, the jury had deliberated without meaningful break for approximately twenty-two or more hours.[22] When the jury first indicated its deadlock, the trial judge declined to impose life imprisonment under article 905.8, which the judge had stated would apply in the event of deadlock. The jurors dissenting from the recommendation of death might well have understood that the judge favored the death penalty. The judge then reinforced this understanding by twice polling the jury and delivering the *Allen* charge.

Four jurors were isolated by the first polling as being opposed to further deliberations. To be sure, the judge had asked, not directly about the jury's numerical division on the question of life versus death, but about its division over the helpfulness of further deliberations. Nevertheless, it is reasonable to conclude that the four jurors opposing further deliberations also opposed the recommendation of death; those jurors who would produce a deadlock by opposing further deliberations knew from what the trial judge had told them about article 905.8 that a deadlock would result in life imprisonment. Clearly, these four knew that the same logic was apparent to the trial judge.

Then, in quick succession to his first polling, the judge, while purporting to rephrase the question, effectively rejected the jurors' responses to the first polling by posing the same question. With their position on the ultimate question exposed, the four jurors might well have understood the second polling on the same question as a signal from the judge that he favored the death penalty. The result of the second polling was predictable: Four dissenters had been whittled down to one. By then rejecting this deadlock, the judge again signalled with inescapable clarity to the one remaining hold-out juror that the bench favored the death penalty. At this point, the judge urged the jurors to return a unanimous verdict. Within thirty minutes,[23] they complied.

The conjunction of the *Brasfield* inquiry and an *Allen* charge is especially condemned because

> the coercive impact of even a modest *Allen* charge is heightened when preceded by any inquiry as to the jury's numerical division. When that is done, the impression is inherently conveyed to the jury that the revelation of their division prompted the giving of the subsequent verdict-urging instruction and that it is, therefore, directed toward the minority jurors.[24]

In practical effect, a trial judge thereby tells minority jurors, especially when their position is known to the judge, to abandon that position. That occurred here: first to the four dissenting jurors and then a second time to the last dissenting juror.

### C.

Were this an ordinary criminal case, the coercive practices outlined above would perhaps be constitutionally permissible. This is not, however, an ordinary case. Here a man has been condemned to death. Because of the "qualitative difference" between death and all other punishments,

---

**22.** *See Kimmel,* 777 F.2d at 295 (length of deliberations as factor).

**23.** *See Fossler,* 597 F.2d at 485 (shortness of time from delivery of *Allen* charge to rendering of verdict as factor).

**24.** *Cornell v. Iowa,* 628 F.2d 1044, 1048 n. 2 (8th Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 944, 67 L.Ed.2d 112 (1981); *see also United States v. Sae-Chua,* 725 F.2d 530, 531–32 (9th Cir.1984).

"there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." [25] Consequently, the Supreme Court " 'has condemned procedures in capital cases that might be completely acceptable in an ordinary case.' " [26]

In addition to the need for extreme reliability in capital cases, the capital sentencing jury is peculiarly vulnerable to coercion, intended or effective, from the bench. In the usual criminal case, the jurors apply *common* legal norms supplied by the court's instructions. By contrast, the breadth of mitigating evidence and considerations available to capital sentencing jurors [27] especially contributes to make theirs a " 'highly subjective, "unique, individualized judgment regarding the punishment that a particular person deserves." ' " [28] Unlike jurors in the usual case, capital sentencing jurors do not necessarily apply the same norms to mitigating evidence. Under these circumstances, deadlock may readily result and persist with no available means of resolution—unless by coercion.

As a society we have evolved too far to permit such coercion of jurors in death penalty cases. Given the critical need for caution in capital cases as well as the particular vulnerability of capital sentencing jurors, the inherently coercive *Allen* and *Brasfield* practices implemented at the sentencing phase of Lowenfield's trial must be condemned as constitutionally repugnant.[29]

Because the majority declines to do so, I must dissent.

---

25. *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (opinion of Stewart, Powell, Stevens, JJ.) (footnote omitted).

26. *Strickland v. Washington,* 466 U.S. 668, 705, 104 S.Ct. 2052, 2073, 80 L.Ed.2d 674 (1984) (Brennan, J., concurring in part and dissenting in part) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 913, 103 S.Ct. 3383, 3405, 77 L.Ed.2d 1090 (1983) (Marshall, J., dissenting)).

27. *Hitchcock v. Dugger,* — U.S. —, 107 S.Ct. 1821, 1822–24, 95 L.Ed.2d 347 (1987); *Skipper v. South Carolina,* — U.S. —, 106 S.Ct. 1669, 1670–71, 90 L.Ed.2d 1 (1986); *see* La.Code Crim. Proc.Ann. art. 905.5(h) (West 1984).

    This was particularly so in the present case. As the majority opinion explains *supra* at 288–

89, the single valid aggravating circumstance supporting Lowenfield's sentence had been found at the guilt-innocence phase of the trial. At sentencing, there remained only mitigating evidence to consider.

28. *Turner v. Murray,* — U.S. —, 106 S.Ct. 1683, 1687, 90 L.Ed.2d 27 (1986) (opinion of White, Blackmun, Stevens, O'Connor, JJ.) (quoting *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 2645 n. 7, 86 L.Ed.2d 231 (1985) (quoting *Zant v. Stephens,* 462 U.S. 862, 900, 103 S.Ct. 2733, 2755, 77 L.Ed.2d 235 (1983) (Rehnquist, J., concurring in judgment))).

29. *See Rush v. State,* 491 A.2d 439, 448–54 (Del. 1985); *Patten v. State,* 467 So.2d 975, 975, 979–80 (Fla.), *cert. denied,* — U.S. —, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985); *Rose v. State,* 425 So.2d 521, 524–25 (Fla.1982), *cert. denied,* 461 U.S. 909, 103 S.Ct. 1883, 76 L.Ed.2d 812 (1983).